**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 23-cr-25 (BAH) |
| MICHAEL BLACKSON, | Chief Judge Beryl A. Howell |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

After midnight, on January 9, 2023, D.C. Metropolitan Police Department ("MPD") officers came upon defendant Michael Blackson, who appeared asleep behind the wheel of a car, which was stopped at a traffic light in Washington, D.C. with its engine running. After rousing defendant awake and directing him to exit the car, officers recovered from the front waistband of his pants a fully loaded Glock semi-automatic pistol with an extended magazine containing 19 rounds of ammunition. Upon a records check, officers discovered that defendant was on probation, after his early release, under the D.C. Incarceration Reduction Amendment Act ("IRAA"), for his 2006 convictions for Second-Degree Murder, Possession of a Firearm During a Crime of Violence, and Carrying a Pistol Without a License, having already completed his sentence for his separate 2006 convictions for Carjacking, Carrying a Pistol Without a License, and Threats To Do Bodily Harm. Defendant has now been charged with one felony count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment at 1, ECF No. 13. The government seeks review of a Magistrate Judge's order releasing defendant pending trial on these charges. *See* Gov't's Mot. for Review & Appeal of Release Order ("Gov't's Mot."), ECF No. 9.

Following a hearing held on January 26, 2023, the government's motion was granted, and defendant was ordered detained pending trial.  Min. Entry (Jan. 26, 2023).  Set out below are the written findings and reasons underlying this order.  *See* 18 U.S.C. § 3142(i)(1) (requiring that a detention order "include written findings of fact and a written statement of the reasons for the detention"); *United States v. Nwokoro*, 651 F.3d 108, 112 (D.C. Cir. 2011) (remanding to the district court for a preparation of "findings of fact and a statement of reasons in support of [defendant's] pretrial detention" when a transcription of the detention hearing was insufficient).

I.      **BACKGROUND**

The government's evidence of the conduct underlying this charge and proffer in support of pretrial detention is described below, followed by a brief overview of the procedural history.

A.      **Defendant's Conduct and Arrest on January 9, 2023**

According to the government's factual proffer, on January 9, 2023, at 1:17 a.m., MPD officers were dispatched to the intersection of South Capitol St. SE and Halley Place in Washington, D.C. and observed a running car parked at a stoplight that had turned green. Statement of Facts at 1, ECF No. 1-1.  The officers approached, smelling the odor of marijuana as they got closer, and saw defendant in the driver's seat seemingly asleep, slumped over the wheel of the vehicle with his foot on the brake and the car in drive.  *Id.*  They also saw a "bulge" in defendant's pants with both of defendant's hands resting over the bulge.  *Id.*  The officers knocked on defendant's vehicle and windows, and shook the car repeatedly to awaken defendant, who was "coming in and out of consciousness."  *Id.*  Once awakened, defendant released the brake, causing the car to lurch into the intersection before defendant again applied the brake.  *Id.* According to the officers, defendant "[s]eemed[] disoriented" and did not initially listen to the officers' instructions.  *Id.*  Once an MPD officer illuminated his police badge with a flashlight, defendant parked the vehicle and lowered his passenger-side window.  *Id.*

At the officers' direction, defendant exited and moved behind the vehicle.  *Id.*  Disclosed by the government for the first time at the January 26, 2023, hearing, officers asked defendant about the bulge in his front waistband and he responded at first, "I won't answer," and then, "[N]othing, I don't have nothing."  Rough Transcript of Hr'g (Jan. 26, 2023) ("Jan. 26, 2023 Hr'g Tr. (Rough)") at 9:3–15.  An officer then conducted a pat down of defendant in search of weapons due to the officers' observation of the "bulge" in defendant's pants.  Statement of Facts at 1.  The officer's experience with firearms led him to recognize a lower receiver in defendant's pants during that search, and after lifting defendant's shirt, officers saw the end of a firearm protruding from defendant's waistband.  *Id.* at 1–2.  The officer removed the firearm, which had an extended magazine holding 19 rounds of ammunition.  *See* Gov't's Mot. at 4.  Defendant was then placed under arrest for "Felon in Possession."  Statement of Facts at 2.  Subsequent review revealed that the firearm was "fully functional and was designed to expel a projectile by the action of an explosive."  *Id.*  An inquiry into the Washington Area Law Enforcement System ("WALES") and the National Crime Information Center ("NCIC") confirmed that the firearm was unregistered, and that the firearm and ammunition were manufactured outside of the District of Columbia and therefore traveled into the District via interstate commerce.  *Id.*

While in custody, officers performed a check of defendant's criminal history and uncovered his prior convictions, in 2006, for violent felonies, described below, for which he served 17 years in prison.  *Id.*  Thus, at the time of his arrest, defendant certainly knew he had prior convictions for crimes punishable by a term of imprisonment exceeding one year.  *Id.*

## B.    Defendant's Criminal History

Defendant was convicted in 2006 of violent felony offenses: second-degree murder and carjacking, as well as firearms offenses, stemming from two different incidents five days apart. On April 24, 2005, MPD officers arrested defendant for the murder of Lavelle James, a 16-year-

old boy, following an altercation at a nightclub.  Gov't's Mot. at 7.  Despite the nightclub security's attempts to deescalate the dispute, upon leaving the venue, defendant drove next to a vehicle in which the victim sat in the passenger seat and defendant fired a single gunshot at the victim's head.  *Id.*  On August 30, 2006, a jury convicted defendant of all three counts levied against him: Second-Degree Murder, Possession of a Firearm During a Crime of Violence, and Carrying a Pistol Without a License, and on November 3, 2006, defendant was sentenced to 33 years' imprisonment with 5 years of supervised release.  *Id.*; *see also United States v. Blackson*, Order Granting Mot. Reduce Sentence Pursuant to Incarceration Reduction Amendment Act (IRAA), Nos. 2005 FEL 3672, 2005 FEL 2436 (D.C. Super. Ct. May 12, 2022) ("May 2022 Order") at 3.

On April 29, 2005, only a few days after shooting James, MPD officers arrested defendant for carjacking an individual with the use of a firearm.  The victim stated that defendant opened his driver-side door "while displaying a firearm and ordered the victim to exit the vehicle."  Gov't's Mot. at 7.  The victim complied and defendant drove away in the stolen vehicle along with an unidentified individual.  *Id.*  After receiving a broadcast about a stolen vehicle, MPD officers located the vehicle, and attempted to make a traffic stop, but defendant, who was driving the car, did not comply.  *Id.*  A foot chase ensued, and officers apprehended defendant, while two unidentified passengers escaped.  *Id.*  On September 18, 2006, defendant pleaded guilty to one count of Unarmed Carjacking with the lesser included offense of Carrying a Pistol Without a License, and Threats to Do Bodily Harm, and on November 3, 2006, defendant was sentenced to 11 years and 8 months with 3 years of supervised release.  *Id.* at 7–8; *see also* May 2022 Order at 4–5.

Defendant's total sentence of imprisonment from his multiple felony convictions in 2006 was 44 years and 8 months.  Gov't Mot. at 8.  On May 12, 2022, after serving 17 years, defendant was resentenced by D.C. Superior Court pursuant to the IRAA.  *See* May 2022 Order. On the second-degree murder conviction, defendant was resentenced to 24-years of incarceration, with the execution of sentence suspended as to all but time served, or 17 years, and supervised probation for 12 months, and on the carjacking conviction, defendant was resentenced to time served.  *See id.* at 20.  Defendant was accordingly released to begin his probationary period in May 2022.  Thus, the arrest occurred in this case approximately eight months into his probation.

### C.    Procedural Background

At defendant's initial appearance, a Magistrate Judge in this District granted the government's oral motion for temporary detention pending defendant's detention hearing.  *See* Gov't Oral Mot. for Temporary Detention (Jan. 12, 2023); Min. Entry (Jan. 12, 2023).  At the detention hearing held before another Magistrate Judge in this District on January 17, 2023, the government orally moved to commit defendant to the custody of the Attorney General and defendant orally moved for release from custody.  *See* Gov't Oral Mot. to Commit Def. to Custody of Attorney General (Jan. 17, 2023); Def.'s Oral Mot. for Release from Custody (Jan. 17, 2023).  At the hearing's conclusion, the Magistrate Judge granted defendant's motion for release, denied the government's motion for detention, and ordered defendant released and subject to both the standard conditions of supervised release as well as the following additional, stringent conditions of release:

> (1) Defendant is placed on home incarceration in his mother Denise Blackson's home in which he may only leave to attend court proceedings.  He may not have visitors other than his mother, his mother's partner, and his son, who also live in the home.  He cannot go outdoors.

5

(2) Defendant may not access the internet, social media, a smartphone, or any device that can access the internet.

(3) Defendant must wear a GPS monitor on his ankle at all times.

(4) Defendant may only contact, by phone or any other means, his mother, his mother's partner, his son, his legal team, and Pretrial Services.

(5) Defendant may not use or possess any alcohol or any controlled substance.

(6) Denise Blackson shall serve as defendant's third-party custodian. She must: always be present with defendant in her home; submit a weekly, sworn affidavit regarding defendant's compliance; ensure that he does not access computers or electronic devices; maintain a complex Wi-Fi password; not permit visitors in the home except immediate family; conduct daily searches of defendant's room; remove the door on defendant's bedroom; monitor her Ring security camera to ensure no unpermitted visitors are entering or exiting her home; ensure that no firearms or explosive devices are in her home; and immediately report any violations of the conditions of release to the police and Pretrial Services.

*See* Proposed Order Setting Conditions of Release, ECF No. 8.[1]

Critical to the Magistrate Judge's determination was his reliance on defendant's mother, Denise Blackson, to serve as the third-party custodian. Before the Magistrate Judge, Ms. Blackson confirmed that she has been an employee of the D.C. government for seven years, *see* Transcript of Magistrate Judge Hr'g (Jan. 17, 2023) ("MJ Hr'g Tr.") at 16:7–12, ECF No. 12, and an elected official on the city's Advisory Neighborhood Commission, a nonpartisan body of the D.C. local government, *see id.* at 12:16–18; Def.'s Opp'n Gov't Request to Overturn Magistrate Court's Release Order ("Def.'s Opp'n") at 1, ECF No. 11. Ms. Blackson also shared that she has a large family with adult children, who are all living on their own and are

---

[1]     The standard conditions of supervised release include: "(1) The defendant must not violate federal, state, or local law while on release[;] (2) The defendant must cooperate in the collection of a DNA sample" while on release; "(3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number[;] (4) The defendant must appear in court as required and, if convicted, must surrender to serve a sentence that the court may impose[; and] (5) The defendant must sign an Appearance Bond, if ordered."  Proposed Order Setting Conditions of Release at 1.

independently successful. *See* MJ Hr'g Tr. at 19:7–19. Her grandson, a successful high school student and defendant's son, lives with her and her partner. *Id.* at 18:4–19:8. The Magistrate Judge underscored how Ms. Blackson is "a pillar of the community, involved with law enforcement . . . and is a representative within the community," *id.* at 30:14–19, and observed that putting her in the position of a third-party custodian makes her defendant's "warden," *id.* at 20:12–20, and amounts to her "essentially incarcerating herself," *id.* at 29:25. He stressed this point directly to Ms. Blackson, stating, "[Y]ou understand what I'm asking you, because you don't have somebody else here today, which means that 24/7 means that you cannot leave your house the moment that he gets in there till . . . whatever happens with his case[,] . . . you are going to be trapped in that house." *Id.* at 22:16–22.

Following his ruling and at the government's request, the Magistrate Judge stayed the release order pending the government's appeal of the order. *See* Min. Entry (Jan. 17, 2023). Defendant has since been detained in D.C. jail without bond. *Id.*

The government then filed a motion for review and appeal of the Magistrate Judge's release order. *See* Gov't's Mot. In response, this Court directed defendant to file any opposition to the government's motion by January 24, 2023, *see* Def.'s Opp'n, and the government to file any reply by January 25, 2023, *see* Min. Order (Jan. 19, 2023). The government chose not to file a reply brief until, at the detention hearing held on January 26, 2023, the government requested an opportunity to supplement its briefing and address certain legal issues raised by defendant. *See* Gov't's Reply Def.'s Opp'n Gov't's Request to Overturn Magistrate Court's Release Order, ECF No. 16; *see also* Min. Entry (Jan. 26, 2023).

## II.     LEGAL STANDARD

### A.     Pretrial Detention Under the Bail Reform Act

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited

pretrial detention of persons who are presumed innocent to a subset of defendants charged with

crimes that are 'the most serious' compared to other federal offenses." *United States v.*

*Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747

(1987)).  Specifically, a detention hearing must be held at the government's request only "in a

case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C.

§ 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct

justice or "threaten, injure, or intimidate a prospective witness or juror," *id.* § 3142(f)(2)(A)–(B).

Thus, a detention hearing must be held on the government's motion when the charged offense

involves, *inter alia*, "any felony that is not otherwise a crime of violence that involves . . . the

possession or use of a firearm or destructive device . . . or any other dangerous weapon, or

involves a failure to register under section 2250 of title 18, United States Code[,]" *id.*

§ 3142(f)(1)(E).

The BRA provides that a judicial officer "shall order the detention of the [defendant]

before trial," *id.* § 3142(e)(1), if, after a detention hearing held under 18 U.S.C. § 3142(f), and

upon consideration of "the available information concerning" enumerated factors, *id.* § 3142(g),

"the judicial officer finds that no condition or combination of conditions will reasonably assure

the appearance of the person as required and the safety of any other person and the community,"

*id.* § 3142(e)(1).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight

risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550

(D.C. Cir. 2019).  The BRA "requires that detention be supported by 'clear and convincing

evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826

F.2d 94, 96 (D.C. Cir. 1987).  Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention.  *Salerno*, 481 U.S. at 755.

In assessing whether pretrial detention or release is warranted, the judicial officer must "take into account the available information concerning" the following four factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).  At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1209–10 (D.C. Cir. 1996) (per curiam).

## B.     Review of a Magistrate Judge's Pretrial Release Order

If a defendant is ordered released under § 3142 by a judicial officer, including "by a magistrate judge," the BRA allows the government to "file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release," which motion must be resolved "promptly."  18 U.S.C. § 3145(a); *see also id.* § 3145(b) (providing the same right of review to a defendant who is ordered detained by a magistrate judge or other judicial officer).  Neither § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and the D.C. Circuit "ha[s] not squarely decided the issue."  *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).  Nonetheless, both the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question,

that a district court reviews a magistrate judge's release or detention order *de novo*.[2]  This

conclusion is confirmed by review of the relevant statutes.  *See United States v. Chrestman*, 525

F. Supp. 3d 14, 23–25 (D.D.C. 2021) (explaining the reasoning behind *de novo* review of

magistrate judge detention orders).

First, the BRA vests the authority to review and ultimately to "determine[]" a motion for

review of a pretrial release or detention order in a "judge of a court having original jurisdiction

over the offense."  18 U.S.C. § 3145(a).  Even when reviewing an order issued under § 3142,

then, the district court exercises its original jurisdiction over the case as a whole, not appellate

jurisdiction over the magistrate judge's release or detention order.  *See, e.g.*, *United States v.

Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990) ("'Because the district court was the court having

original jurisdiction of the felonies charged, the district judge was not exercising an appellate

jurisdiction[.]'" (quoting *United States v. Thibodeaux*, 663 F.2d 520, 522 (5th Cir. 1981))).

Moreover, § 3145(a) and (b) explicitly provide for the filing of a "motion" to revoke or

amend the magistrate judge's order.  18 U.S.C. § 3145(a), (b).  In contrast, § 3145(c), the BRA's

provision for review of a district court's release or detention order by a court of appeals,

references the filing of an "appeal" to be governed by 28 U.S.C. § 1291 and 18 U.S.C. § 3731.

---

[2]      For Court of Appeals decisions uniformly endorsing a *de novo* standard of review, *see United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003) ("The standard of review for the district court's review of a magistrate judge's detention or release order under § 3145(a) is *de novo*."); *United States v. Kirkaldy*, 181 F.3d 83 tbl. (2d Cir. 1999) ("On a motion for revocation or amendment of the detention order, a district court should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." (internal quotation marks and citation omitted)); *United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir. 1992) ("When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions for release."); *United States v. Tortora*, 922 F.2d 880, 883 n.4 (1st Cir. 1990) ("We believe that the proper approach is for the district court to engage in de novo review of the contested order."); *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990) (collecting cases and holding that the district court should conduct a *de novo* review of the magistrate judge's detention decision); *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989) ("A defendant ordered detained by a magistrate may seek de novo review in the district court."); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc) (stating that district court's review of magistrate judge's order setting bond was de novo); *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985) (holding that district court did not err in reviewing *de novo* a magistrate judge's detention decision).

This deliberate choice by Congress to style review of magistrate judge decisions as "motions" rather than "appeals" indicates that the district court's review occupies a procedural posture more similar to a motion for reconsideration of its own decision, at which stage both factual and legal findings are open to revision, than to appellate review, at which stage deference to factual findings is appropriate.  Thus, the BRA "'confer[s] a responsibility on the district court to reconsider the conditions of release fixed by another judicial officer . . . as unfettered as it would be if the district court were considering whether to amend its own action,'" *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc) (quoting *Thibodeaux*, 663 F.2d at 522), a responsibility that can be satisfied only through *de novo* review.

This conclusion is further bolstered by the Federal Magistrates Act, which confers upon magistrate judges "the power to . . . issue orders pursuant to [the BRA] concerning release or detention of persons pending trial." 28 U.S.C. § 636(a)(2).  Like the BRA, the Federal Magistrates Act is silent as to the appropriate standard for review of magistrate judge orders under § 3142.  Elsewhere, however, the statute expressly provides that a district court may reconsider a magistrate judge's order regarding nondispositive pretrial matters only where the order "is clearly erroneous or contrary to law." *Id.* § 636(b)(1)(A).  This provision shows that Congress knew how to require more deferential review of magistrate judges' orders and chose to omit similar language from § 636(a)(2)'s authorization of BRA decisions, implying that a different standard of review applies in the BRA context.  Viewed in light of the principle that a magistrate judge's actions "take[] place under the district court's total control and jurisdiction," *United States v. Raddatz*, 447 U.S. 667, 681 (1980), the absence of a statutory mandate for deferential review of pretrial release and detention orders in the Federal Magistrates Act lends

further support to the premise that, as clearly indicated by the text and structure of the BRA, Congress intended for review under § 3145 to be conducted *de novo*.

In short, both the BRA and the Federal Magistrates Act lead to the conclusion that a district court reviews a magistrate judge's pretrial release or detention order *de novo*. Unsurprisingly, this view is shared by every circuit court to have addressed the standard of review under § 3145, *see supra* note 2, and by the Local Rules of this Court, *see* LCRR 59.3(b) (providing for "de novo review by the Chief Judge" of any order issued by a magistrate judge in an unassigned criminal case, including pretrial detention or release orders).  A reviewing district court therefore undertakes the analysis outlined in § 3142, described *supra* Part II.A, without deference to the magistrate judge's findings.

## III.  DISCUSSION

The government argues that pretrial detention is warranted because "[d]efendant's violent criminal history coupled with his possession of a loaded, concealed firearm while on supervision, overwhelmingly demonstrate that he is a danger to the community."  Gov't's Mot. at 9.  In considering the evidence proffered and arguments made at the detention hearings held, on January 17 and 26, 2023, as well as the requisite § 3142(g) factors, the Court concludes that the government has demonstrated, by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure" the safety of the community if defendant is released, 18 U.S.C. § 3142(e)(1), and therefore orders that defendant be detained pending trial.[3] The statutory factors are discussed below and demonstrate the gravity of defendant's offense in the instant case.

---

[3]     Indisputably, this case required a detention hearing, upon the government's motion, since defendant is charged with a felony offense that involves "the possession . . . of a firearm or destructive device." 18 U.S.C. § 3142(f)(1)(E).

A.        **The Nature and Circumstances of the Offense**

The first statutory factor requires consideration of "the nature and circumstances of the offense charged, including whether the offense is a crime of violence."  18 U.S.C. § 3142(g)(1).  As the D.C. Circuit explains, "[t]he distinction between 'nature' and 'circumstances' clarifies that the former refers to the generic offense while the latter encompasses the manner in which the defendant committed it," *Singleton*, 182 F.3d at 12, making case-specific facts the focus for the pretrial detention or release decision.  Here, as to the generic nature of the offense, defendant has been indicted for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).  *See* Indictment at 1.  This is a serious crime, for which defendant is facing a term of imprisonment, if convicted, of "not more than 15 years," 18 U.S.C. § 924(a)(8).

Further, as to the circumstances of the offense conduct, detailed *supra* in Part I.A, the government's factual proffer is that defendant was found by MPD officers seemingly asleep behind the wheel of a running car at a traffic light, with his hands over a "bulge" in his pants, and that officers spent several minutes getting him to wake-up and exit his vehicle, where a pat-down search uncovered a loaded and unregistered firearm with an extended magazine of 19 rounds of ammunition.  Statement of Facts at 1–2; *see also* Gov't's Mot. at 4.  Further, as detailed *supra* in Part I.B, defendant was recently released from prison only about eight months before his arrest, having served 17 years for violent crimes of second-degree murder, carjacking, and gun offenses, for which he remains on supervision.

Distilled from this set of circumstances are several critical considerations in assessing whether any condition or combination of conditions will reasonably assure the safety of any other person and the community were defendant released pretrial.  First, illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's

pants, while out in public, poses an inherent risk of danger to the community.  *See United States v. Gassaway*, No. 21-cr-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-mj-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence," particularly when defendant's prior convictions indicate a predilection for violence); *United States v. Riggins*, 456 F. Supp. 3d 138, 144 (D.D.C. 2020) ("[T]he possession of a firearm, especially while seemingly on a drug such as PCP, presents a serious danger to the community."); *cf. United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) (incorrectly concluding that § 922(g) is a crime of violence triggering a pretrial detention hearing but observing, in applying the § 3142(g) factors, that "possession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public").

Defendant discounts the danger posed by the condition of the firearm (semi-automatic pistol with fully loaded with extended magazine) and its location (in his front waistband), because, he argues, he was not brandishing the gun or using the gun in connection with any other criminal activity.  *See* Def.'s Opp'n at 8–9; Jan. 26, 2023 Hr'g Tr. (Rough) at 23:18–24:10.  To be sure, such active use of a gun in connection with or to facilitate another criminal offense would heighten the danger to the community and other persons.  Yet, the absence of such evidence does little to detract from the existing facts about the condition of the firearm and its placement on defendant's person that support detention.  Notably, the firearm was a semiautomatic Glock, loaded with 19 rounds of ammunition in an extended magazine, and was ready to use.  *See* Statement of Facts 1–2; Gov't's Mot. at 4; Jan. 26, 2023 Hr'g Tr. (Rough) at

5:18–20.  An extended magazine allows the firearm to carry more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm.  *See* Jan. 26, 2023 Hr'g Tr. (Rough) at 5:25–6:4.  The firearm's placement is also probative since this gun was tucked into defendant's front waistband under his hands at the ready, on his person, and easily within reach.  *See* Statement of Facts at 1–2; Jan. 26, 2023 Hr'g Tr. (Rough) at 5:5–9.

Relatedly, defendant also suggests he may have possessed the firearm, as defense counsel put it, for "personal safety or protection."  Def.'s Opp'n at 8–9.  Given defendant's prior conviction for shooting in the head and killing Lavelle James following a public altercation, *see* Gov't's Mot. at 7, this excuse for his possession of a loaded gun provides no comfort at all and instead confirms concern about defendant's willingness to use the gun when he may feel threatened.

The second circumstance present here compounding the inherent danger in unlawfully possessing a firearm is that defendant was not in a mental state to operate a gun safely.  Although the government alleges that the responding MPD officers smelled marijuana while approaching defendant's car, *see id.* at 3, the government also concedes that officers did not perform a search of the vehicle for any narcotics before the car was released into the custody of defendant's family member nor was a sobriety or drug test performed on the scene or after defendant was arrested and detained, *see* Jan. 26, 2023 Hr'g Tr. (Rough) at 7:12–14.  That said, defendant does not dispute that he was somehow incapacitated when the officers approached him, unable to operate his running car at a stoplight, *see* Def.'s Opp'n at 8, which supports that he was in no position to possess a firearm in full awareness of the dangers it posed.

Third, defendant's prior criminal history stands out for the extreme violence underlying his prior convictions for second-degree murder, carjacking, and firearms offenses, and makes his unlawful possession of a loaded firearm especially troublesome.

Finally, defendant was on supervision at the time of his arrest making evident his disregard of the law forbidding his possession of a firearm and automatically raising concern about whether he can be trusted to comply with any conditions of pretrial release. *See Cole*, 459 F. Supp. 3d at 120 (affirming magistrate judge's pretrial detention order on § 922(g) charge of defendant who carried concealed, loaded firearm in residential area "[w]hile on supervision for armed robbery—a violent offense," despite defendant's close community ties, youth, and prior employment); *Riggins*, 456 F. Supp. 3d at 147–48 (denying defendant's emergency motion for pretrial release when he was on supervised probation for an assault conviction at the time of his arrest for violating § 922(g)).

Defendant knew his own criminal history and that his prior felony convictions prohibited him from possessing a firearm. *See* Statement of Facts at 2. In fact, at the January 26, 2023, hearing, the government revealed that, when officers asked defendant about the bulge in his front waistband, he responded, "I won't answer," and then, "[N]othing, I don't have nothing," Jan. 26, 2023 Hr'g Tr. (Rough) at 9:3–15, suggesting defendant's knowledge that his possession of a firearm was unlawful. He also knew that he was on probation—defendant was regularly reporting to D.C. Probation and Parole, including experiencing a home visit by his probation officer on December 29, 2022, and being drug tested on December 7, 2022, and defendant was scheduled to report again on January 4, 2023. *See* Pretrial Services Report at 3, ECF No. 4.

These proffered facts encompassing the alleged unlawful possession of a firearm offense committed while on probation, coupled with the circumstances surrounding defendant's

encounter with MPD officers on January 9, 2023, and his prior violent criminal history, strongly favors pretrial detention.

### B.     The Weight of the Evidence Against Defendant

Before considering the second factor—the weight of the evidence against defendant—the threshold question of how this factor shall be weighed in the pretrial release or detention analysis requires attention.

#### 1.     *Weight-of-the-Evidence Factor*

Defendant argues that this factor "is the least important of the factors and the bail statute neither requires nor permits a pretrial determination of guilt." Def.'s Opp'n at 9–10 (quoting *United States v. Gebro*, 948 F.2d 1118, 1121–22 (9th Cir. 1991)). Three other judges on this Court have cited approvingly, but without analysis, to that point in *Gebro*.[4] Contrary to *Gebro,* the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors.

First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors. *See* 18 U.S.C. § 3142(g); *see also United States v. Zhang*, 55 F.4th 141, 152 (2d Cir. 2022) ("Moreover, § 3142(g) itself does not suggest any hierarchy among the various factors to be considered by a court in a detention hearing."). Thus, to minimize the value of the weight-of-the-evidence factor automatically in every instance, as

---

[4]     *See United States v. Klein*, 533 F. Supp. 3d 1, 15 (D.D.C. 2021) (Bates, J.); *United States v. Padilla*, 538 F. Supp. 3d 32, 43 (D.D.C. 2021) (Bates, J.); *see also United States v. McAbee*, No. 21-cr-35-7 (EGS), 2022 WL 4016616, at *10 n.9 (D.D.C. Sept. 3, 2022) (Sullivan, J.); *United States v. McAbee*, No. 21-cr-35-7 (EGS), 2021 WL 6049909, at *12 (D.D.C. Dec. 21, 2021) (Sullivan, J.); *United States v. Fitzsimons*, No. 21-cr-158 (RC), 2021 WL 4355411, at *5 (D.D.C. Sept. 24, 2021) (Contreras, J.); *United States v. Brown*, No. 21-mj-565 (RC), 2021 WL 4033079, at *6 (D.D.C. Sept. 3, 2021) (Contreras, J.); *United States v. Gieswein*, No. 21-cr-24 (EGS), 2021 WL 3168148, at *15 (D.D.C. July 27, 2021) (Sullivan, J.); *United States v. Texeira-Spencer*, No. 21-cr-145 (JDB), 2021 WL 1535309, at *6 (D.D.C. Apr. 19, 2021) (Bates, J.).

defendant suggests, impermissibly reads a new requirement into § 3142(g) that Congress did not intend nor imply in the clear text of the statute.

Furthermore, while not opining on this specific issue, the D.C. Circuit has held that the § 3142(g) factors should be considered both individually and in their totality as applied to the specific facts of the case, including the risks posed by release and the role that supervisory conditions play in mitigating those risks. *See United States v. Hale-Cusanelli*, 3 F.4th 449, 457 (D.C. Cir. 2021) (finding that the district court did not err in its pretrial detention determination, by considering the "totality of the circumstances" surrounding defendant's criminal charges, including the weight of the evidence against defendant); *United States v. Stanley*, 469 F.2d 576, 580 n.14 (D.C. Cir. 1972) ("For judges, of course, remains the often difficult task of assigning proper weight to [the § 3142(g)] factors, singly and in combination, and in assessing the risks incidental to enlargement and the efficacy of an imposition of conditions to minimize them.").

Additionally, at least one Circuit court has squarely disagreed with the relevant point in *Gebro*.[5]  In *Zhang*, 55 F.4th 141 (2d Cir. 2022), the Second Circuit rejected a similar argument that "[p]utting significant weight on [the weight of the] evidence . . . undermines the presumption of innocence to which a defendant is entitled." *Id.* at 149.  "In making a predictive assessment of the defendant's future dangerousness if released into the community," the *Zhang* court reasoned, "common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence," to support that "the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail." *Id.* at 150.  The court also held that weighing the strength of the evidence does not undermine a

---

[5]      While the Eighth Circuit does not directly confront *Gebro*'s analysis on the second factor, in *United States v. Abad*, 350 F.3d 793, 798–99 (8th Cir. 2003), that appellate court affirmed a pretrial detention decision because "[s]trong evidence" linked defendant to the alleged crime and did not give any less importance to the weight-of-the-evidence factor.

defendant's presumption of innocence because "[t]he presumption of innocence 'is a doctrine

that allocates the burden of proof in criminal trials; . . . it has no application to a determination of

the rights of a pretrial detainee'" because pretrial detention is "regulatory in nature," not meant to

punish a defendant for criminal activity, but to ensure the safety of the public.  *Id.* at 151–52

(citing *Bell v. Wolfish*, 441 U.S. 520, 533 (1979)).  *See Salerno*, 481 U.S. at 746–48 (holding that

pretrial detention is "regulatory" and not meant to punish).

The Court agrees with the Second Circuit's reasoning in *Zhang*.  Considering the weight

of the evidence against defendant is not a pretrial determination of guilt nor does such

consideration undermine any presumption of innocence to justify discounting this statutory

factor in relation to the other § 3142(g) factors.  Both the statute and case law are clear in stating

that the weight of the evidence is only relevant to the pretrial, regulatory determination of

whether defendant is a flight risk or a danger to the community, which defendant may challenge

at the detention hearing, pursuant to 18 U.S.C. § 3142(f).  *See Salerno*, 481 U.S. at 747 ("The

legislative history of the Bail Reform Act clearly indicates that Congress did not formulate the

pretrial detention provisions as punishment for dangerous individuals[;]" rather, "Congress

instead perceived pretrial detention as a potential solution to a pressing societal problem . . . .

There is no doubt that preventing danger to the community is a legitimate regulatory goal.");

*United States v. Alston*, 420 F.2d 176, 179 (D.C. Cir. 1969) ("It is not the purpose of the bail

system either to punish an accused again for his past crimes, or to punish him in advance for

crimes he has not yet been shown to have committed."); *see also Gebro*, 948 F.2d at 1121–22

("[T]he bail statute neither requires nor permits a pretrial determination of guilt." (citing *United

States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)).  In essence, the pretrial review of the

evidence for BRA purposes is a separate and distinct analysis—occurring at an early stage in

criminal proceedings—from the determination of defendant's guilt or innocence at trial.  Courts

are familiar with engaging in this type of pretrial factfinding, *see, e.g.*, *Zhang*, 55 F.4th at 152 n.1

(citing, by way of example, *United States v. Geaney*, 417 F.2d 1116, 1118–21 (2d Cir. 1969),

which held "that [the] trial court must make pretrial findings by a preponderance of the evidence

on the existence of a conspiracy in order to determine whether the co-conspirator exception to

the hearsay rule applies"), and that analysis similarly does not encroach on a defendant's guilt or

innocence.  Thus, any alleged fear of overlap between the weight of the evidence and the

presumption of innocence lacks merit and does not justify lessening the importance of the second

§ 3142(g) factor.

Finally, the weight of the evidence is a common-sense consideration.  For instance, if the

evidence against a defendant is overwhelming, credible, helpful, and important to the

government's case in chief, that may increase the risk that defendant will flee to avoid future

court proceedings and may indicate that the defendant is a present danger to himself or the

community if the government's allegations later prove to be true.  Alternatively, if the only

evidence against a defendant is circumstantial, contradicted, or unreliable, the defendant has less

reason to duck court proceedings in the interest of proving his innocence and that evidence does

not support viewing the defendant as a risk to the safety of the community.  As such, the weight

of the evidence against defendant will be weighed as all factors are—in accordance with the

specific facts of this case—to determine whether pretrial detention is appropriate.

### 2.    *Consideration of Weight-of-the-Evidence Factor Favors Detention*

In applying the second factor to the instant motion, the weight of the evidence against

defendant is overwhelming and strongly favors detention.  As previously discussed, both the

firearm and ammunition were found on defendant's person—loaded, easily accessible in his

front waistband, and at the ready—not located elsewhere in the car out of defendant's reach.  *See*

Statement of Facts at 1–2; Jan. 26, 2023 Hr'g Tr. (Rough) at 5:5–20.  The vehicle in which defendant sat was registered as his own and he was alone in that vehicle.  *See* Gov't's Mot. at 6.  Defendant also initially denied possessing the firearm, *see* Jan. 26, 2023 Hr'g Tr. (Rough) at 9:3–15, then upon his arrest, told police that he indeed purchased and possessed the firearm and ammunition, *see* Gov't's Mot. at 6, indicating his awareness that he was not permitted to carry a gun.  Therefore, the weighty evidence against defendant also favors detention.

> **C.     The History and Characteristics of Defendant**

The third factor requiring examination of defendant's history and characteristics also weighs in favor of detention.  What stands out is defendant's prior convictions for extremely violent felonies, including second-degree murder and carjacking, along with firearm offenses.  *See* Gov't's Mot. at 7.  The serious and violent nature of these prior convictions are probative of both defendant's capacity for and willingness to use firearms in a manner that poses a risk to others and the community.  *See United States v. McSwain*, No. 19-cr-80 (CKK), 2019 WL 1598033, at *3–5 (D.D.C. Apr. 15, 2019) (detaining § 922(g) defendant who had prior conviction for assault with significant bodily injury); *Cole*, 459 F. Supp. 3d at 120–21 (detaining § 922(g) defendant who had prior conviction for armed robbery).

Defendant's counterarguments are not persuasive on this factor.  Defendant points to the fact that his convictions occurred in 2006 and also that he had few major disciplinary instances while incarcerated as a sign of defendant's maturity.  *See* Def.'s Opp'n at 5.  This 17-year period of incarceration, until his release eight months ago, significantly limited his opportunities for additional criminal conduct, leaving that time period as an assessment of his nonviolence inconclusive.  This is particularly true in light of both facts that, while serving his 17-year sentence, defendant was disciplined in 2018 for fighting another inmate, *see* May 2022 Order at

8, and that his alleged charged offense conduct of possessing easy access to a loaded firearm, with an extended magazine.

Defendant also cites to his activities since his release from custody and his efforts to contribute positively to his community. *See* Def.'s Opp'n at 5–8. Ironically, defendant describes his efforts in the community as designed to deescalate violence, an effort difficult to reconcile with his alleged illegal possession of a loaded and unregistered firearm for the purpose of "personal protection" and "personal safety," according to his counsel. *See* Def.'s Opp'n at 8–9.

Lastly, it bears noting that defendant received a significant break of leniency when the D.C. Superior Court reduced his 44-year sentence to 17 years largely based on an assessment that defendant had matured, rehabilitated himself, and learned and grew from his mistakes such that he would not reoffend. *See* May 2022 Order at 11–12. Yet, defendant now finds himself charged with a felony federal offense while still on probation.

In short, defendant's history and characteristics weigh in favor of detention.

### D.   The Nature and Seriousness of the Danger Posed by Defendant's Release

The fourth factor, the nature and seriousness of the danger to the community posed by the defendant's release, also weighs heavily in favor of detention. In reaching this conclusion, the same considerations that inform the analysis of the other factors are pertinent. At the outset, it cannot be gainsaid that unlawful possession of a firearm that is unregistered and fully loaded, with an extended capacity magazine, carried in a position of easy, quick access poses a significant danger to other persons and the community. Defendant was well aware that his possession of this gun was unlawful, as indicated by his initial denial of the gun's presence in his waistband. *See id.* at 9:3–15 (when asked about the "bulge" in his front waistband, defendant initially responded, "I won't answer," and then, "Nothing, I don't have nothing"). Even after he provided a statement to MPD officers following his arrest and the reading of his *Miranda* rights,

defendant did not disclose how or from whom he obtained the unregistered firearm.  *See* Jan. 26, 2023 Hr'g Tr. (Rough) at 8:24–9:3.  This leaves open the possibility that defendant once released could reopen those channels to obtain another unregistered gun.

Defendant attempts to provide assurance as to his compliance with any release conditions by pointing to his family members, who wish to support him and keep him out of trouble, namely his mother and teenage son.  *See* Def.'s Opp'n at 10; MJ Hr'g Tr. at 10:14–11:2.  That defendant's family remains dedicated to his welfare is undoubtedly true.  Those statements about defendant's family support harken back, however, to the D.C. Superior Court's resentencing decision in which that court viewed defendant's "vast support network" as evidence that "upon release, he will lead a productive and law-abiding life."  May 2022 Order at 18–19.  Unfortunately, that view is indelibly tarnished given defendant's instant charge only eight months into his probationary period.  From this, defendant has shown that his vast support network at this stage is not enough to deter him from engaging in criminal conduct.

In cases with the trifecta of circumstances present here—*i.e.*, instant charge for unlawful possession of a loaded firearm, criminal history of a violent crime conviction involving a firearm, and instant offense conduct occurring while on supervision or probation—a determination of pretrial release is an outlier, not the norm.  *See, e.g.*, *Simpkins*, 826 F.2d at 97 (concluding that "the defendant indeed poses a substantial risk of danger to the community" when he had prior convictions "for violent and/or handgun-related crimes, including multiple counts of armed robbery and assault with a gun" and "while on parole, [] was in possession of two handguns, of which at least one was loaded"); *Gassaway*, 2021 WL 4206616, at *3–4 (overruling magistrate judge's home confinement order and instead ordering defendant detained pending trial on charge of Felon in Possession, 18 U.S.C. § 922(g)(1), because, *inter alia*,

"unlawfully carrying a concealed or loaded firearm in public poses a risk of danger to the public[,]" especially when the defendant has "*four* prior felony convictions for gun-related offenses") (emphasis in original); *United States v. Lee*, 451 F. Supp. 3d 1, 3 (D.D.C. 2020) (Jackson, K.B., J.) (denying motion for emergency release of defendant charged with violation of 18 U.S.C. § 922(g), when at time of his arrest defendant was on supervised probation for prior conviction of two firearm offenses, resulting from an attempted robbery and was on pretrial release for assault); *Howard*, 2020 WL 5642288, at *2 (ordering pretrial detention of defendant charged with violating 18 U.S.C. § 922(g), due to danger of defendant who "possessed, within easy reach and concealed in his front pocket, a fully-loaded semi-automatic weapon while he was out in public," and was on supervision for his prior convictions for unlawful possession of a handgun, and had prior narcotics convictions and violent felonies, including Second Degree Assault, Conspiracy to Commit Armed Carjacking, and Motor Vehicle Theft).  This Court has no difficulty concluding that defendant's pretrial release would pose a danger to the community.

### E.    No Condition or Combination of Conditions Suffice

Notwithstanding that consideration of all four factors in § 3142(g) favor pretrial detention, defendant argues that the "government fails to establish that" the strict conditions for pretrial relief proposed by the Magistrate Judge "are inadequate."  Def.'s Opp'n at 3.  The two-page list of additional conditions of home incarceration imposed on defendant by the Magistrate Judge are indeed exhaustive, reflecting most plainly recognition of the danger defendant's pretrial release would pose.

The success of the proposed conditions rise and fall on the ability of defendant's mother as third-party custodian to uphold them.  Unquestionably, defendant's mother is willing to take on the enormous responsibility of serving as the third-party custodian of her son.  This responsibility, as the Magistrate Judge aptly described her role, would put her in the position of

serving as a "warden" to her son's incarceration.  *See* MJ Hr'g Tr. at 20:13–14.  She would have

to watch him around the clock without leaving her home for any reason—for groceries, fresh air,

or religious services—without prior approval by the Court, conduct a daily search of his

bedroom, remove the door on defendant's bedroom, submit a weekly affidavit confirming

defendant's compliance, and report any violations of his confinement to the Court.  *See* Proposed

Order Setting Conditions of Release at 2, 5–6.  Her inability to uphold the conditions of release

puts her at risk of criminal and civil punishment.  *See* MJ Hr'g Tr. at 38:23–24.  Nonetheless,

these proposed conditions do leave obvious gaps: for example, defendant's mother cannot

monitor defendant while she is sleeping or if she is required to leave the house for her

employment, which may not allow remote work for the duration of pretrial proceedings.  Other

residents in the house, or other family members, must pick up the slack when defendant's mother

cannot exit the home.

     Since other people live in the same house, including defendant's mother's partner and

grandson, the job of warden would necessarily cover the conduct of these other people to ensure

they did nothing to disturb or frustrate the stringent conditions on defendant, such as exposing

defendant to the internet or other topics on social media, and limiting visitors to only immediate

family members.  All the while, these other residents are not subject to the affidavit and reporting

requirements that apply to defendant's mother as the custodian, leaving her essentially to monitor

three individuals at once.

     The proposed conditions impose responsibilities similar to those of full-time and

professional employees at detention facilities, but without the benefit of shifts or breaks in

service as custodian.  Defendant's mother's capability to uphold those conditions long-term is

questionable.  Certainly, the Magistrate Judge attempted to assuage skepticism about the long-

term ability of defendant's mother to fulfill all the proposed conditions, and defendant's mother obliged by affirming her willingness and ability to do so. *See, e.g.*, MJ Hr'g Tr. at 20:4–24:4; 39:18–19. Regardless of whether defendant's mother is a pillar of the community with ties to local government and law enforcement, *see* Def.'s Opp'n at 10; MJ Hr'g Tr. at 20:25–21:1, she was and has been part of defendant's support community that unsuccessfully kept him out of the court system following his release only last May. She is currently permitted to work from home for "maybe two or three months for now" and after that, she will have to "see" about her ability to work remotely every day. MJ Hr'g Tr. 17:17–23. Defendant argued that other individuals were approved as third-party custodians to cover gaps in his mother's availability, *see* Def.'s Opp'n at 10, but that risks inconsistency in the conditions of home incarceration that, as of now, are completely placed on his mother. To be clear, a benefit of professional detention facilities is the consistency in insuring detention conditions. Defendant's ability to obtain a fully loaded and unregistered gun while on probation, despite the family support he enjoys, underscores that the best intentions and most valiant efforts of defendant's mother to fulfill all the proposed conditions provide no guarantee these conditions will be maintained to the letter for the duration, possibly many months, of defendant's pretrial proceedings.

The instant offense coupled with defendant's history and characteristics show that any conditions of supervised release would not reasonably mitigate the danger his pretrial release poses. *See* 18 U.S.C. § 3142(e)(1). Accordingly, taking all four statutory factors set out in § 3142(g) factors into account both individually and in totality, *see Hale-Cusanelli*, 3 F.4th at 457; *Stanley*, 469 F.2d at 580 n.14, this Court finds that they strongly weigh in favor of pretrial detention and that defendant would pose a danger to the public were he released.

## IV.    CONCLUSION

Upon consideration of the Indictment, the government's Motion for Review and Appeal of Release Order, the evidence proffered and arguments presented in connection with the government's motion, including at the detention hearing held on January 26, 2023, the entire record, and the factors set forth in 18 U.S.C. § 3142(g), the Court finds that all four statutory factors weigh heavily in favor of pretrial detention.  The government has thus met its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions can be imposed that would reasonably ensure the safety of the community were he to be released pending trial.  18 U.S.C. § 3142(e)(1), (f)(2).  Accordingly, the government's Motion for Review and Appeal of Release is granted and defendant shall remain in the custody of the Attorney General for confinement pending a final disposition in this case.  *See* 18 U.S.C. § 3142(i).

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  February 6, 2023

_____

BERYL A. HOWELL
Chief Judge